**UNITED STATES DISTRCT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

TROY ANTHONY MCFARLAND, SR., )
)
    Petitioner, )
)    Case No. 3:21-cv-00519
    v. )
)    Judge Marvin E. Aspen
UNITED STATES OF AMERICA, )
)
    Respondent. )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us is Troy Anthony McFarland, Sr.'s ("McFarland Sr.") motion to

vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 due to ineffective assistance of

counsel. (Defendant McFarland's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to

20 [sic] U.S.C. § 2255 ("Motion") (Civ. Dkt. No. 1) at 1.)[1] For the reasons stated below, we

deny the Motion.

## BACKGROUND

Between September 2014 and April 2015, the Drug Enforcement Administration

("DEA") investigated the distribution of diverted prescription pills and heroin in this District.

*See United States v. McFarland*, 766 F. App'x 301, 304 (6th Cir. 2019); Crim. Dkt. No. 529 at

17:12–14. The investigation involved several wiretaps. *McFarland*, 766 F. App'x at 304; Crim

Dkt. No. 529 at 17:14–21. In February 2015, DEA agents intercepted a phone call between

McFarland Sr. and Daunte Lillard in which McFarland Sr. directed Lillard to deposit money in

---

[1] We use "Civ. Dkt." to refer to the docket for the instant case, *McFarland v. United States*, 3:21-cv-00519 (M.D. Tenn.), and "Crim. Dkt." to refer to the docket for the corresponding criminal case, *United States v. Cervantes et al.*, 3:15-cr-00072-5 (M.D. Tenn.).

two bank accounts at different banks to avoid detection by the authorities. *McFarland*, 766 F. App'x at 304. During a second call later that day, McFarland Sr. told Lillard that he had purchased ten phones to give to Lillard and other members of their organization, explaining that it would be more difficult for law enforcement to track their calls if they used the new phones. *Id*. Later that month, law enforcement intercepted another call between McFarland Sr. and Lillard, in which McFarland Sr. directed Lillard to deposit money into a different account. *Id*.

On April 7, 2015, Los Angeles Sheriff's Department officers stopped Shantoya Fannin at the Los Angeles International Airport and seized approximately $20,260 from her. *Id*. A search of Fannin's phone revealed that she had been communicating with McFarland Sr. *Id*. For example, approximately one week earlier, Fannin had texted McFarland Sr. that she needed money. *Id*. Fannin's phone also revealed that on April 3, 2015, McFarland Sr. had arranged for Fannin to fly from Los Angeles to Nashville, where McFarland Sr.'s son, Troy McFarland, Jr., picked up Fannin and drove her to a hotel. *Id*. Agents believe that Rachel Siegelman then gave Fannin the funds that she requested. *Id*. at 304–05. The day after Fannin received the funds, she returned to Los Angeles, where officers detained her. *Id*. at 305. Soon after officers stopped Fannin, DEA agents intercepted a call between Fannin and McFarland Sr. *Id*. Minutes after that call, McFarland Sr. called Lillard and told him to "throw that phone away" and "kill the line." *Id*.

Twelve days later, DEA agents learned that McFarland Sr. was near a home located at 712 Cielo Vista Road in Lexington, Kentucky (the "Cielo Vista home"). *Id*. Agents watched the Cielo Vista home and saw that a blue Chrysler and a gold Hyundai frequented the home. *Id*. They later discovered that the blue Chrysler was driven by McFarland Sr. and the gold Hyundai by Siegelman. *Id*. When McFarland Sr. left the Cielo Vista home, a Kentucky State Police

2

officer stopped him, and McFarland Sr. consented to a search of his vehicle. *Id*. The police officer found $5,000, as well as the cellphone that DEA agents were tracking. *Id*. The police officer arrested McFarland Sr. for driving on a suspended license. *Id*. McFarland Sr. made bond and was picked up by his son. *Id*. Agents proceeded to track McFarland Sr. and his son and noticed that a gold Hyundai was following them. *Id*. Officers stopped and searched both cars but did not find guns or drugs. *Id*.

Later that day, DEA agents listened to a call between Lillard and Willie Thompson discussing what agents believed to be the sale of pills at a Courtyard Marriott Hotel in Nashville, Tennessee. *Id*. Lillard, Thompson, and McFarland Jr. met at the hotel parking lot. *Id*. DEA agents approached them and ordered McFarland Jr. out of Lillard's vehicle. *Id*. McFarland Jr. reached into his pants and threw approximately $24,000 in cash onto the vehicle's console. *Id*. Agents arrested the men and then went to a room at the hotel registered to "McFarland." *Id*.

There, they found McFarland Sr., Siegelman, and "large amounts of diverted pills," which were either "out in plain view" or "concealed inside large vitamin bottles." (Crim. Dkt. No. 529 at 19:21–20:5.) The pills were later tested and found to be 871 oxycodone 30-milligram pills, 1,280 oxymorphone 40-milligram pills, and 945 hydromorphone 4-milligram pills. (*Id*. at 20:6–13.)

On April 21, 2015, DEA agents executed a search warrant at the Cielo Vista home and found hydrocodone pills, oxycodone pills, and crack cocaine in the master bedroom, along with McFarland Sr.'s driver's license, letters addressed to him, and a computer with "Troy McFarland" displayed on the screen. *McFarland*, 766 F. App'x at 305–06; *see also* Crim. Dkt. No. 529 at 20:14–21. They also found marijuana, Xanax pills, heroin, a kilo-press, an assault rifle, a handgun, and ammunition magazines elsewhere in the home. *McFarland*, 766 F. App'x

3

at 306. The home contained other items consistent with drug trafficking as well, such as four cellphones, cutting agents, electrical tape, gloves, masks, charcoal, food saver/sealer machines, and packaging materials. *Id*.

On May 20, 2015, McFarland Sr. was indicted on one count of conspiracy to distribute and to possess with intent to distribute Schedule II drugs. (Crim. Dkt. No. 44 at 3.) The indictment contained four counts in total and named Lillard, Siegelman, McFarland Jr., and three other individuals as defendants as well. (*See generally id*.) A superseding indictment later named additional defendants, including Thompson. (*See* Crim. Dkt. No. 98.)

## I.       Plea Proceedings

On September 15, 2015, McFarland Sr. pled "Not Guilty" to the lone charge against him. (*See* Crim. Dkt. No. 112.) Slightly less than one year later, on August 10, 2016, McFarland Sr. moved to schedule a change-of-plea hearing, stating that he intended "to enter an open plea of guilty." (Crim. Dkt. No. 264.) Judge Sharp, who was presiding over the case at the time, granted the request and set a hearing for August 24. (*See* Crim. Dkt. No. 272.) The day of the hearing, McFarland Sr. moved to continue the hearing so that he could discuss his decision to plead guilty with his mother. (*See* Crim. Dkt. No. 280.) Judge Sharp granted the request and rescheduled the hearing for September 14. (*See* Crim. Dkt. No. 283.) On August 25, McFarland Sr.'s counsel moved to reset the change-of-plea hearing to an earlier date (*see* Crim. Dkt. No. 287), only to move to strike that filing the following week (*see* Crim. Dkt. No. 295). In the motion to strike, counsel explained that he was planning on meeting with McFarland Sr. to address certain questions that had arisen. (*See* Crim. Dkt. No. 295.) Judge Sharp granted the motion to strike (*see* Crim. Dkt. No. 296) and reset the hearing to September 16 (*see* Crim. Dkt. No. 298). But on September 15, McFarland Sr. moved to strike the hearing because he no longer

4

wanted to plead guilty. (*See* Crim. Dkt. No. 304.) Judge Sharp again granted the request. (*See* Crim. Dkt. No. 305.)

On September 26, defense counsel filed a renewed motion to schedule a change-of-plea hearing, stating that McFarland Sr. intended "to enter an open plea of guilty" to the one count for which he had been charged. (*See* Crim. Dkt. No. 311.) Judge Sharp set a hearing for October 12. (*See* Crim. Dkt. No. 313.) On October 11, however, McFarland Sr. advised Judge Sharp that he had changed his mind—he no longer wished to plead guilty, and he wanted to strike the change-of-plea hearing date. (*See* Crim. Dkt. No. 320.) Judge Sharp granted the motion but stated that he would still hold a status conference on October 12. (*See* Crim. Dkt. No. 321.)

At the outset of the October 12 status conference, counsel for the government informed Judge Sharp:

> I have had numerous discussions with [defense counsel] regarding trying to resolve this case, and as the docket reflects, the defendant has filed notices of intent to plea, I don't know if it is two or three different times, at least two. So based upon those filings, my discussions with [defense counsel], I have not superseded yet, not sought to supersede. But I think enough is enough, and so I'm going to go ahead and . . . seek to supersede. . . . I had asked for a status conference today so we could pick a trial date as well as to put on the record to make sure that the defendant understands, I'm sure [defense counsel] has already shared this with him, but when I seek to supersede, I would expect a money laundering charge in violation of 18 U.S.C. 1956; I would expect a firearms charge in violation of 18 U.S.C. 924(c); and I would also expect that I will file an information pursuant to Section 851. If the defendant were to be convicted of all those, that would increase his offense level by two levels on the money laundering. There would be a five-year consecutive sentence in addition to any of the drug charges on the 924(c) charge. And by filing the 851, that would raise his maximum possible penalty from 20 years . . . to 30 years.

(Crim. Dkt. No. 529 at 2:19–3:16.) Judge Sharp asked McFarland Sr. if he understood the implications of the superseding indictment, and McFarland Sr. stated that he did. (*Id*. at 4:8–10.) Defense counsel asked Judge Sharp for a moment, and then reported that McFarland Sr. had

changed his mind and would like to plead guilty. (*Id*. at 4:13–25.) Judge Sharp gave McFarland Sr. an opportunity to speak further with his attorney, and after doing so, McFarland Sr. confirmed that he would like to plead guilty before the superseding indictment was filed. (*Id*. at 4:25–5:6, 5:15–18, 6:21–24.)

Judge Sharp proceeded with the plea colloquy. During the colloquy, McFarland Sr. confirmed, among other things, that:

- He understood that he was entering an open plea, and there was no agreement with the government (*Id*. at 7:5–10);

- He understood the nature of the charge to which he was pleading guilty, including what the government would have to prove to convict him (*Id*. at 10:10–11:10);

- He had told his attorney all that he knew about the charges against him, and he believed that his attorney was fully aware of the facts on which the charge was based (*Id*. at 11:11–16);

- He was satisfied with the representation that he had received and the advice that he had been given, and had no complaints about his counsel (*Id*. at 11:17–22);

- No one had forced him to plead guilty through threats, force, or promises (*Id*. at 11:23–12:6);

- He was pleading guilty of his own free will because he was "in fact guilty" (*Id*. at 12:7–10);

- He understood that the possible maximum sentence was a term of 20 years in prison, a fine of not more than $1 million, supervised release of at least three years, and a $100 special assessment (*Id*. at 12:14–18);

6

- He understood that the Sentencing Guidelines are advisory and that the court could depart from the recommended range to "fashion a sentence that's sufficient but not more harsh than necessary" (*Id.* at 13:6–14:5); and

- He understood that he was waiving his right to a jury trial (*Id.* at 15:6–16:12).

The government then set forth its evidence if the case were to go to trial. (*Id.* at 16:21–20:21.) McFarland Sr. confirmed that government counsel had told the truth concerning his crimes and that he was guilty of the charge filed against him, although he reserved the right to challenge certain Sentencing Guidelines calculations. (*Id.* at 21:15–22:5.) With all of this in mind, McFarland Sr. pled guilty. (*Id.* at 22:6–8.)

Judge Sharp then confirmed that McFarland Sr.'s counsel had reviewed the plea petition with McFarland Sr. and gave McFarland Sr. the opportunity to ask further questions about it. (*Id.* at 22:9–19.) McFarland Sr. had no questions. (*Id.* at 22:14–19.) In the plea petition, McFarland Sr. acknowledged, among other things, that:

- He and his attorney had "thoroughly discussed the government's case against [him] and [his] potential defenses" (Crim. Dkt. No. 323 ¶ 4);

- The crime for which he was charged carried "imprisonment of not more than twenty (20) years, a $1,000,000.00 fine or both, a term of supervised release of at least three (3) years and a $100.00 special assessment" (*Id.* ¶ 5);

- His attorney had estimated that the advisory calculation for his case was 135–168 months but the Guidelines range would be calculated by the United States Probation Office, and the court was not bound by the Guidelines (*Id.*);

- His attorney had "done all that anyone could do to counsel and assist [him]" (*Id.* ¶ 8);

7

- His attorney had "done all the investigation and research . . . that [McFarland Sr. had] asked him to do" (*Id.*);

- He was satisfied with the representation that he had received up to that point in time (*Id.*); and

- His guilty plea was not the result of a plea agreement between his lawyer and the prosecution under the provisions of the Federal Rules of Criminal Procedure (*Id.* ¶ 10).

Despite the confirmations he made during his plea colloquy and the statements he made in his plea petition, McFarland Sr. now contends that his counsel failed to return his calls and failed to update him on new and additional discovery during plea negotiations. (*See* Motion at 10.) McFarland Sr. also maintains that his counsel did not advise him of a plea deadline and that plea negotiations between his counsel and the government ended because his counsel did not respond to the government by this deadline. (*Id.*)

## II. Sentencing Proceedings

McFarland Sr.'s case was later reassigned to us for sentencing. (Crim. Dkt. No. 404.) The probation department calculated a Sentencing Guidelines range of 210 to 240 months' imprisonment. *McFarland*, 766 F. App'x at 306. This calculation included a two-point enhancement for possession of a firearm and a four-point enhancement for leadership in a criminal activity involving five or more participants. *Id.* The government requested that we sentence McFarland Sr. to 210 months. *Id.* McFarland Sr. objected to the enhancements, arguing that the government had not proven that he constructively possessed the firearms found in the Cielo Vista home or that the firearms were connected to the offense. *Id.* Further, McFarland Sr. argued that he only deserved a two-point enhancement for leadership because he only exercised control over one person. *Id.* He requested that we "impose a mitigated sentence

. . . below the advisory guideline range calculated in the presentence report" but did not seek a particular sentence. (*See* Crim. Dkt. No. 442 at 1.) After considering testimony and argument by both sides, we sentenced McFarland Sr. to 200 months' imprisonment, followed by 3 years of supervised release—a sentence that was below the Sentencing Guidelines' range. *McFarland*, 766 F. App'x at 304; Crim. Dkt. Nos. 478, 513.

McFarland Sr. timely appealed his sentence. (Crim. Dkt. No. 516.) McFarland argued on appeal that his sentence enhancements were improper, his criminal history was overstated, and we did not adequately meet the requirements of 18 U.S.C. § 3553 when sentencing him. *McFarland*, 766 F. App'x at 307. On March 18, 2019, the Sixth Circuit affirmed McFarland Sr.'s sentence. *Id*. at 304. McFarland Sr. then retained new counsel and filed the instant Motion.

## STANDARD OF LAW

A prisoner may petition the court that sentenced him to vacate, correct, or set aside his sentence under 28 U.S.C. § 2255. *See Mallett v. United States*, 334 F.3d 491, 496 (6th Cir. 2003). "To succeed on a § 2255 motion, a prisoner in custody must show '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *McPhearson v. United States*, 675 F.3d 553, 558–59 (6th Cir. 2012) (quoting *Mallett*, 334 F.3d at 496–97).

The prisoner bears the burden of setting forth facts that entitle him to relief. *Potter v. United States*, 887 F.3d 785, 787–88 (6th Cir. 2018) (citing *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006)). To meet this burden, he must do more than offer "[b]ald assertions and conclusory allegations." *Thomas v. United States*, 849 F.3d 669, 681 (6th Cir. 2017).

9

**ANALYSIS**

**I.     Ineffective Assistance of Counsel**

McFarland Sr. seeks relief under § 2255 on the theory that there was an error of constitutional magnitude—specifically, that he was denied his Sixth Amendment right to effective assistance of counsel.  (Motion at 7.)  The Sixth Amendment guarantees a criminal defendant "'the right to the effective assistance of counsel.'"  *Strickland v. Washington*, 466 U.S. 668, 685–86, 104 S. Ct. 2052, 2063 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14 (1970)).  Criminal defendants "have a right to the assistance of counsel during 'critical stages' of the prosecution," including plea negotiations.  *Maslonka v. Hoffner*, 900 F.3d 269, 278 (6th Cir. 2018) (quoting *Turner v. United States*, 885 F.3d 949, 955 (6th Cir. 2018)).

The standard for ineffective assistance of counsel claims, however, is "rigorous" and "highly demanding."  *Kimmelman v. Morrison*, 477 U.S. 365, 381–82, 106 S. Ct. 2574, 2586 (1986).  To prevail on a claim for ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that he was prejudiced by the deficient performance.  *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.  If a petitioner "makes 'an insufficient showing on one'" prong, we may resolve his claims based on that prong alone.  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069).

Regarding the first prong, deficient performance, attorneys are held to an objective standard of reasonableness "under prevailing professional norms."  *Id*. at 688, 104 S. Ct. at 2065.  Courts considering ineffective assistance of counsel claims "must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"

*Thomas*, 849 F.3d at 675 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). "[E]ven if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (quoting *Burt v. Titlow*, 571 U.S. 12, 23–24, 134 S. Ct. 10, 18 (2013) (alteration in original)).

Regarding the second prong, prejudice, a petitioner challenging his guilty plea based on ineffective assistance of counsel "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 58–59, 106 S. Ct. 366, 370 (1985). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

According to McFarland Sr., his counsel erred in four respects. (*See* Motion at 1.) First, counsel did not apprise him of developments in the case. (*Id*.) Second, counsel did not hire an investigator to examine circumstances surrounding the Cielo Vista home. (*Id*.) Third, counsel did not properly negotiate a plea deal. (*Id*.) And fourth, counsel did not adequately advise McFarland Sr. about the sentencing guidelines. (*Id*.) McFarland Sr. contends that but for these failures, he would not have pled guilty and would have instead insisted on a jury trial. (*Id*.) We will consider each of the alleged deficiencies in turn.

### A. Failure to Advise Concerning Developments in the Case

McFarland Sr. claims that his counsel did not return his calls, update him on new and additional discovery, or let him know about the deadline for accepting a plea deal. (Motion at 10.) As a result, McFarland continues, he missed the deadline for the plea deal, did not know the results of additional discovery by the time that he entered his guilty plea, and was not able to

11

participate fully in plea negotiations. (*Id.*) According to the government, however, McFarland Sr.'s assertions are contradicted by the record, which reflects that defense counsel met with McFarland Sr. "extensively" and that he was satisfied with counsel's performance. (United States' Response to Motion to Vacate Sentence Under 28 U.S.C. § 2255 ("Response") (Civ. Dkt. No. 9) at 12–13.) Below, we analyze each of counsel's alleged failures to communicate.

### i. Failure to Return Calls

McFarland Sr. claims that his attorney failed to return his calls, and as a result, he was not able to participate fully in the plea negotiations. (*See* Motion at 10.) There is no question that counsel has "duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. Nor can it be disputed that a defendant should be able to participate fully in plea negotiations, even if he is not entitled to a plea agreement. *See Missouri v. Frye*, 566 U.S. 134, 143–47, 132 S. Ct. 1399, 1408–09 (2012) (observing that plea bargains have become "central to the administration of the criminal justice system" and stating that counsel has a duty to relay formal plea offers to the accused for the accused's consideration).

But McFarland Sr.'s allegation that counsel did not return his calls during plea negotiations is belied by the record. During the October 12 plea proceedings, McFarland Sr.'s counsel said that he and McFarland Sr. "communicate well." (Crim. Dkt. No. 529 at 3:21–22.) Counsel also stated that he had been representing McFarland Sr. since McFarland Sr.'s arrest and that he saw McFarland Sr. "almost weekly." (*Id.* at 4:18–20.) When McFarland Sr. was given the opportunity to speak, he did not object to or correct anything that his counsel had said. (*See, e.g.*, *id.* at 11:17–22.) To the contrary, during his plea colloquy, McFarland Sr. confirmed under oath that he was satisfied with the representation and advice that he had received and that he had

no complaints about his counsel. (*Id*. (Q: Are you satisfied with [your counsel's] representation and the advice he has given you? A: Yes, sir. Q: Do you have any complaints at all about [counsel]? A: No, sir.).) McFarland Sr. also signed a plea petition, in which he represented that he and his attorney had "thoroughly discussed the government's case against [him] and [his] potential defenses" (Crim. Dkt. No. 323 at ¶ 4), his attorney had "done all that anyone could do to counsel and assist [him]" (*id*. ¶ 8), and he was satisfied with the representation that he had received up to that point in time (*id*.).

Petitioners are bound by statements they make to the court unless they can demonstrate "extraordinary circumstances" or offer "some explanation of why [they] did not reveal [the conflicting information] when specifically asked to do so by the court." *See Ramos v. Rogers*, 170 F.3d 560, 563 (6th Cir. 1999) (internal quotation marks and citations omitted); *see also Blackledge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629 (1977) ("[T]he representations of the defendant [at a plea hearing] . . . constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity."); *Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012) ("Petitioner's statements at the plea colloquy carry a strong presumption of truth.").

Despite advising Judge Sharp that he was pleased with his attorney, McFarland Sr. now alleges that counsel failed to return his calls. (*See* Motion at 10.) Because McFarland Sr. knew about counsel's alleged failure to return his calls prior to pleading guilty and has not explained why he did not share that complaint with Judge Sharp when asked, we do not credit this allegation. *See Blackledge*, 431 U.S. at 74, 97 S. Ct. at 1629; *Ramos*, 170 F.3d at 563; *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005) ("Judges need not let litigants contradict themselves so readily; a motion that can succeed only if the defendant committed perjury at the

13

plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction."); *Hatcher v. United States*, No. 2:19-CV-00037-JRG-CRW, 2022 WL 394692, at *4 (E.D. Tenn. Feb. 8, 2022) ("[W]hen a petitioner . . . later tries to double back on sworn statements made in open court, he generally cannot succeed on a claim of ineffective assistance of counsel."). Accordingly, McFarland Sr. has not shown that his attorney was deficient by allegedly failing to return his calls.

### ii. Failure to Update McFarland Sr. on New Discovery

McFarland Sr. also asserts that counsel "failed to update [him] on new and additional discovery." (Motion at 10.) Specifically, McFarland Sr. learned after the case concluded that his counsel had made inquiries regarding "the inspection of and photographs of the items seized in the search of the Cielo Vista home." (*See id*.) According to McFarland Sr., counsel then either (1) failed to complete the inquiries or (2) completed the inquiries but failed to discuss the results with him before he pled guilty.[2] (*See id.*)

As noted above, counsel has a duty to "keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. But even if McFarland Sr.'s counsel failed to complete inquiries into discovery or discuss these inquiries with McFarland Sr. before he pled guilty, McFarland Sr. does not explain why these alleged failures were significant. *See Huff v. United States*, 734 F.3d 600, 608 (6th Cir. 2013) ("Even when trial counsel's performance is deficient under prevailing standards, we grant relief only if there is a reasonable probability that, but for counsel's unprofessional errors, the result of

---

[2] It is unclear from McFarland Sr.'s motion exactly what he claims here. The relevant portion of his Motion states: "The results of [the inquiry into the Cielo Vista home] were not discussed with Mr. McFarland. Such discussion, in fact, the inquiry itself should have been completed before Mr. McFarland entered his guilty plea." (Motion at 10.)

14

the proceeding would have been different.") (internal quotation marks and citations omitted). To the point, McFarland Sr. does not explain—even in general terms—why a review of the "items seized in the search of the Cielo Vista home" would have changed the outcome of the case. Consequently, McFarland Sr. has not plausibly alleged that counsel's failure to complete or to report the results of discovery into the Cielo Vista home prejudiced him. *See Djerf v. Ryan*, 931 F.3d 870, 882–83 (9th Cir. 2019) (judge properly rejected argument that counsel provided ineffective assistance by failing to adequately investigate certain matters where it was unclear what evidence counsel would have uncovered or the significance of that evidence); *Staten v. United States*, No. 3:10-0029, 2011 WL 662969, at *6 (M.D. Tenn. Feb. 14, 2011) (dismissing allegation that counsel "failed to conduct a minimal investigation that might have possibly led to potential mitigating evidence" where petitioner "offered no factual support for the allegations").

### iii. Failure to Advise McFarland Sr. on Deadline for Plea Offer

McFarland Sr. further claims that counsel did not respond to the government's plea offer before a certain deadline and, as a result, plea negotiations ended. (Motion at 10.) It is unclear whether McFarland Sr. learned of his attorney's alleged failure before or after he pled guilty. McFarland Sr. states that he was "never" made aware of the deadline for responding to the government and only became aware of the missed deadline after reviewing his counsel's correspondence with the government. (*Id.*)

Even if we assume that McFarland Sr.'s counsel failed to advise McFarland Sr. of a plea negotiation response deadline and submit a response by that deadline, and that counsel was deficient in doing so, McFarland Sr. has not plausibly alleged that counsel's conduct prejudiced him. "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a

reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Frye*, 566 U.S. at 147, 132 S. Ct. at 1409.  McFarland Sr. has not done so here.  Although McFarland Sr. alleges that if counsel had advised him of the deadline for responding to the government's offer, he "would have advised his trial counsel on what to respond back to the Government" (Motion at 10), McFarland Sr. does not explain how this response would have yielded a better result for him. *See Frye*, 566 U.S. at 147, 132 S. Ct. at 1409 (noting that on the facts before the Court, it was "necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time").  Indeed, McFarland does not explain what more advantageous result he would have obtained had he and his counsel responded by the government's deadline.  Accordingly, even if we were to credit McFarland Sr.'s allegation that counsel was deficient in not communicating to him the deadline to respond to a plea offer, McFarland Sr. has not adequately alleged that the deficiency prejudiced him.

* * *

Counsel's alleged failure to return McFarland Sr.'s calls is not a plausible deficiency considering the record,  and even if we assume that McFarland Sr.'s counsel failed to (1) advise him of the results of new discovery and (2) apprise him of the deadline for responding to the government's plea offer, McFarland Sr. has not adequately alleged that he was prejudiced by these failures.  For the reasons set forth above, counsel's purported failure to communicate with McFarland Sr. does not support McFarland Sr.'s claim to § 2255 relief.

### B.  Failure to Hire an Investigator

McFarland Sr. next argues that his attorney failed to hire an investigator to investigate how often McFarland Sr. was at the Cielo Vista home, despite McFarland Sr.'s request that he do

16

so. (Motion at 10–11.) McFarland Sr. claims that an investigation would have been discovered that he was not at the Cielo Vista home as often as the government had alleged. (*Id*.) This discovery, McFarland Sr. continues, might have supported a downward departure from the Sentencing Guidelines, mitigated his participation in the conspiracy, or have been used to negotiate a better plea deal. (*Id*. at 11.)

The government responds that McFarland Sr.'s argument is unavailing because: (1) what McFarland Sr. claims would have been found if the investigation had been conducted is an unsubstantiated conclusion; (2) McFarland Sr.'s counsel was aware of the evidence surrounding the Cielo Vista home; (3) McFarland Sr. himself knew how often he went to the Cielo Vista home; (4) the government's evidence was strong; (5) during the plea proceeding, McFarland Sr. admitted that his attorney performed all of the investigation that McFarland Sr. had requested; and (6) McFarland Sr.'s argument only applies to a two-point offense level adjustment. (Response at 13.) The government has the better argument.

We must disregard McFarland Sr.'s allegation that counsel failed to investigate how often he was at the Cielo Vista home because it is directly contradicted by McFarland Sr.'s representations to Judge Sharp. During the plea hearing, McFarland Sr. stated under oath that he was satisfied with the representation that he had received. (*See* Crim. Dkt. No. 529 at 11:17–22.) He also entered a plea in which he confirmed that his attorney had "done all the investigation and research . . . that [McFarland Sr. had] asked him to do." (Crim. Dkt. No. 323 ¶ 8.) As noted above, defendants are bound to sworn statements they make to the Court absent extraordinary circumstances or some explanation for their inconsistent statements. *See Blackledge*, 431 U.S. at 74, 97 S. Ct. at 1629; *Ramos*, 170 F.3d at 563; *Peterson*, 414 F.3d at 827; *Hatcher*, 2022 WL 394692, at *4. McFarland Sr. has not made any attempt to reconcile the statements he made

during the sentencing hearing and in his plea petition with the allegations he now makes in his § 2255 petition. Therefore, the contradictory assertions in his § 2255 petition must be disregarded. *See Blackledge*, 431 U.S. at 74, 97 S. Ct. at 1629; *Ramos*, 170 F.3d at 563; *Peterson*, 414 F.3d at 827; *Hatcher*, 2022 WL 394692, at *4.

McFarland Sr. has not convinced us that he was prejudiced by counsel's alleged failure to investigate either. McFarland Sr. claims that if his attorney had conducted the requested investigation, his attorney would have discovered that he was not at the Cielo Vista home as often as the government had alleged. (Motion at 10–11.) But McFarland Sr. knew how often he had been to the Cielo Vista home, and he stated under oath that he had told his attorney everything he knew about the charge against him. (Crim. Dkt. No. 529 at 11:11–16.) "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. It is unclear what further investigation would have yielded, as McFarland Sr. has not identified a single witness or piece of evidence supporting his position that counsel could have pursued but did not. (*See* Motion at 10–11.) Without an explanation as to what beneficial evidence might have been obtained, the purported benefits of the requested investigation are speculative. *See Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995) (observing that "[a]bsent an account of what beneficial evidence investigation" would have yielded, petitioner could not satisfy the prejudice prong of the *Strickland* test).

This conclusion is bolstered by the fact that the government had substantial evidence connecting McFarland Sr. to the Cielo Vista home and to the conspiracy more broadly. For example, the government had evidence that McFarland Sr. leased the Cielo Vista home and had

stayed there shortly before the DEA uncovered "heroin, oxycodone pills, two firearms, and a kilo press" there. (Crim. Dkt. No. 529 at 20:14–21.) DEA agents also found McFarland Sr. and another co-defendant in a hotel room registered under "McFarland," along with "large amounts of diverted pills." (*Id*. at 19:21–20:4.) Additionally, McFarland Sr. was heard "discussing the possession and distribution of diverted prescription pills and [the] laundering of the proceeds from the sale of those pills with" one of his co-defendants. (*Id*. at 18:6–10.) McFarland Sr. does not explain how the frequency with which he visited the Cielo Vista home might have mitigated his sentence in light of the rest of the evidence presented.

At the sentencing hearing, McFarland Sr.'s ties to the Cielo Vista home were discussed in the context of a two-point firearms enhancement. (*See* Crim. Dkt. No. 528 at 94:21–106:13.) We concluded that McFarland Sr. had constructive possession of weapons found at the Cielo Vista residence not only because he "frequented the house" but also because "he leased the premises" and "[h]is clothes, drugs were in easy proximity to the firearms." (*Id*. at 106:4–8.) Additionally, we determined that McFarland Sr. had not met his burden to show that it is clearly improbable that the firearms found at the Cielo Vista residence were connected to the offense. (*Id*. at 106:9–12.) The frequency with which McFarland Sr. visited the Cielo Vista home was only one factor of several justifying our decision to overrule his objection to the firearms enhancement. Accordingly, we cannot say that we would have reached a different result if counsel had produced evidence showing that McFarland Sr. visited the Cielo Vista home less frequently. The allegation that counsel failed to investigate the circumstances surrounding the Cielo Vista home does not satisfy either of the two prongs of the *Strickland* test.

### C. Failure to Negotiate a Better Plea Deal

Based on a review of his counsel's emails with the government, McFarland Sr. believes that there was a breakdown in communication between his counsel and the government that caused him to get a worse plea offer than his co-defendants. (Motion at 11.)

The government has three responses. First, the government argues that McFarland Sr. was not entitled to a plea deal. (Response at 10.) Second, the government claims that though McFarland Sr. and the government did not enter into a Rule 11(c)(1)(C) plea agreement, McFarland Sr. still "had a plea deal because he was permitted to plead open to one count to avoid additional charges and exposure." (*Id*. at 10–11.) Third, there was adequate communication between McFarland Sr. and his attorney. (*Id*. at 10.)

McFarland Sr.'s assertion that he was deprived of effective assistance of counsel because counsel did not negotiate a better plea deal suffers from the same infirmity as some of his other arguments: it contradicts statements in the record. As noted above, McFarland Sr. repeatedly affirmed that he was satisfied with counsel's performance during his plea hearing and in his plea petition. (*See, e.g.*, Crim. Dkt. No. 529 at 11:17–22; Crim. Dkt. No. 323 ¶ 8.) He offers no explanation as to why he takes a different position now. (*See* Motion at 11.)

Further, the notion that McFarland Sr. would have gotten a better plea deal if his attorney had pursued a different strategy is speculative. *See, e.g.*, *Clark v. Lewis*, 1 F.3d 814, 823 (9th Cir. 1993) (rejecting a defendant's argument concerning ineffective assistance of counsel where the possibility of an alternate plea agreement was "pure speculation"). McFarland Sr. states that but for the "breakdown in communication" between his attorney and the government, he would not have gotten "a worse plea offer than his co-defendants[:] an offer to plea[d] guilty as charged and have a sentencing hearing." (Motion at 11.) But he provides no factual support for this

20

assertion. For example, he does not provide any information about the sentences that his co-defendants received, the nature of their involvement in the scheme, or mitigating factors that affected their sentences. (*Id.*)

In fact, the record reflects that if McFarland Sr. had not pled guilty, the government would have filed a superseding indictment that added a money laundering charge, in violation of 18 U.S.C. § 1956, and a firearms charge, in violation of 18 U.S.C. § 924(c). (Crim. Dkt. No. 529 at 2:19–3:9.) The government also intended to file an information pursuant to 21 U.S.C. § 851. (*Id.* at 2:19–3:10.) At McFarland Sr.'s sentencing hearing, the government explained that if McFarland Sr. were convicted of all of the additional charges, his offense level would have increased by two levels on the money laundering charge; "[t]here would be a five-year consecutive sentence in addition to any of the drug charges on the 924(c) charge;" and "by filing the 851 . . . [the] maximum possible penalty" would rise "from 20 years . . . to 30 years." (*Id.* at 3:11–16.) That is significantly greater than the custodial sentence that McFarland received: 200 months (ten months below the Sentencing Guidelines). *See McFarland*, 766 F. App'x at 304; Crim. Dkt. Nos. 478, 513. The record reflects that McFarland Sr. weighed the option of pleading guilty to the conspiracy to distribute controlled substances charge against the option of defending himself against that charge and others, and that he knowingly and intelligently chose the first option. (*See* Crim. Dkt. No. 529 at 2:19–3:16, 3:21–4:25, 5:15–18.) Accordingly, McFarland Sr. has not alleged that counsel was deficient in failing to negotiate a better plea deal or that he was prejudiced as a result.

### D. Failure to Advise About the Sentencing Guidelines

McFarland Sr. claims that counsel "promised" him that he "would not have to serve more than 10 years if found guilty" of the charge against him. (Motion at 11.) He asserts that had he

known that the Sentencing Guidelines range was substantially longer than 10 years, "he would have taken his chances at trial." (*Id.*)

The government contends this allegation is also belied by the record, but even if it were true, counsel's error was cured through the Court's Rule 11 colloquy. (Response at 16.) During the colloquy, McFarland Sr. acknowledged that he faced a maximum possible sentence of 20 years for the charge to which he pled guilty. (*Id.*) He further acknowledged that his counsel had informed him that the Sentencing Guidelines are advisory and that he could be sentenced outside of them. (*Id.*) Moreover, the sentencing guidelines that McFarland's counsel calculated were greater than 10 years. (*Id.*) McFarland Sr. also acknowledged in both his plea petition and Rule 11 colloquy that no one promised him a particular sentence or made any promises to get him to plead guilty. (*Id.*)

We agree with the government. Yet again, McFarland Sr.'s allegation is contradicted by his prior statements to Judge Sharp. For example, during the plea colloquy, McFarland Sr. confirmed that no one had made any promises to him to convince him to plead guilty. (*See* Crim. Dkt. No. 529 at 12:4–6 (Q: Is anyone making any promises to you to plead guilty? A: No, sir.).) He has provided no explanation for his inconsistent statements, and therefore, the allegation in his petition must be disregarded. *See Blackledge*, 431 U.S. at 74, 97 S. Ct. at 1629; *Ramos*, 170 F.3d at 563; *Peterson*, 414 F.3d at 827; *Hatcher*, 2022 WL 394692, at *4.

Further, even if counsel "promised" McFarland Sr. that he would not have to serve more than 10 years in prison if he was found guilty, counsel's misstatement was cured by the plea colloquy. During the plea hearing, McFarland Sr. acknowledged that the possible maximum sentence for his crimes included a term of 20 years in prison. (Crim. Dkt. No. 529 at 12:14–18.) He also conceded that the Sentencing Guidelines are advisory and that the court could depart

22

from the recommended range to "fashion a sentence that's sufficient but not more harsh than necessary." (*Id*. at 13:6–14:5.) There can be no dispute that before McFarland Sr. pled guilty, he knew the potential consequences of doing so. Consequently, McFarland Sr. has not adequately alleged that he was prejudiced by counsel's alleged promise. *See Boyd v. Yukins*, 99 F. App'x 699, 703 (6th Cir. 2004) (even if counsel provided incorrect information concerning the sentencing range, that misunderstanding was corrected by the trial court, and therefore, petitioner's plea was knowing and intelligent); *Ramos*, 170 F.3d at 565 (petitioner was not prejudiced by counsel's purported misstatements where the trial court's colloquy cured any misunderstanding)*; Black v. United States*, Nos. 3:12-CV-288-TAV, 3:07-CR-61-TAV-HBG, 2015 WL 4873086, at *9 (E.D. Tenn. Aug. 13, 2015) (petitioner had not adequately alleged that counsel's erroneous sentencing advice prejudiced him where he was correctly advised of his sentencing exposure during the plea colloquy and acknowledged the same).

* * *

For the reasons set forth above, we conclude that none of the grounds set forth in McFarland Sr.'s petition entitles him to § 2255 relief. That conclusion would not change if we were to consider counsel's alleged deficiencies collectively. *See Thomas*, 849 F.3d at 679 ("Individually, each of Thomas's Sixth Amendment claims fail, and bundling them together does not increase their merit."); *Campbell*, 364 F.3d at 736 (observing that because petitioner had not shown that any of the alleged instances of ineffective counsel deprived him of a fair trial, he could not show that the accumulation of counsel's alleged errors warranted relief). Accordingly, McFarland Sr.'s petition is denied.

## II.     Request for a Hearing

Finally, McFarland Sr. makes a conclusory request for an evidentiary hearing.  (Motion at 12.)  The government argues that an evidentiary hearing is not necessary because McFarland Sr.'s claims are not supported by the record, are conclusory, and are incredible.  (Response at 20.)

It is within our discretion to grant or deny a habeas petitioner's request for an evidentiary hearing.  *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007); *Koelblin v. United States*, Case Nos. 1:15-CR-0011, 1:16-CV-1996, 2016 WL 7012302, at *1 (N.D. Ohio Dec. 1, 2016) (applying *Schriro* standard to § 2255 case).  "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro*, 550 U.S. at 474, 127 S. Ct. at 1940; *Koelblin*, 2016 WL 7012302, at *1.  We need not have a hearing where the petitioner's allegations are "contradicted by the record, inherently incredible, or conclusions rather than statements of facts."  *Huff*, 734 F.3d at 607 (internal quotation marks and citations omitted); *see also Koelblin*, 2016 WL 7012302, at *3 (concluding that petitioner was not entitled to an evidentiary hearing because the record refuted his factual allegations and precluded habeas relief); *Black*, 2015 WL 4873086, at *6 (denying request for evidentiary hearing where "[p]etitioner ha[d] not identified any material factual dispute requiring resolution by way of an evidentiary hearing").

Here, no evidentiary hearing is necessary because McFarland Sr. has done nothing more than provide "[b]ald assertions," "conclusory allegations," and statements directly contradicted by the record.  *See Thomas*, 849 F.3d at 681; *see also O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961) ("Conclusions, not substantiated by allegations of fact with some probability

24

of verity, are not sufficient to warrant a hearing.").  Many of the allegations in his § 2255 petition contradict statements in the record, and McFarland Sr. has offered no explanation for the inconsistencies.  *See United States v. Lemaster*, 403 F.3d 216, 220–21 (4th Cir. 2005) ("When deciding whether an evidentiary hearing is necessary to resolve a § 2255 motion contesting a guilty plea, first a court must determine whether the petitioner's allegations, when viewed against the record of the Rule 11 plea hearing, were so palpably incredible, so patently frivolous or false as to warrant summary dismissal . . . .  [I]n the absence of extraordinary circumstances, . . . allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always palpably incredible and patently frivolous or false.") (internal quotation marks and citations omitted); *Lasiter v. Thomas*, 89 F.3d 699, 703 (10th Cir. 1996) ("[The petitioner] [i]s bound by his solemn declarations in open court and his unsubstantiated efforts to refute that record [a]re not sufficient to require a hearing.  This case does not involve the most extraordinary circumstances.") (internal quotation marks omitted); *Koelblin*, 2016 WL 7012302, at *3.  And where McFarland Sr. provides some explanation for inconsistent statements or his statements are not contradicted by the record, he has not provided a cogent explanation as to how counsel's conduct prejudiced him.  *See Huff*, 734 F.3d at 608 (observing that it is not necessary to hold an evidentiary hearing where counsel's alleged defective performance was inconsequential).  McFarland Sr.'s request for an evidentiary hearing is denied.

## CONCLUSION

For the reasons set forth above, McFarland Sr.'s § 2255 petition is denied without an

evidentiary hearing.  It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: April 7, 2022